Filed 8/1/14  Conservatorship of Sanchez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person and Estate of VICTORIA C. SANCHEZ. | |
| HELEN GUTIERREZ as Co-conservator etc. et al., | E056173 |
| Petitioners and Respondents, | (Super.Ct.No. RCRS00499) |
| v. | OPINION |
| MARGARET SANCHEZ, | |
| Objector and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. Michael Welch, Judge.  Affirmed.

Young & Young and George W. Young for Objector and Appellant.

Ward & Ward, Alexandra S. Ward; and Laura E. Gonzalez for Petitioners and Respondents.

Victoria C. Sanchez (Mother) was a conservatee in the years prior to her death. Mother had six children. Three of Mother's children were Co-conservators: (1) Joe C. Sanchez (Sanchez), (2) Stella Yazell (Yazell), and (3) Helen Gutierrez (Gutierrez) (collectively, Co-conservators). Another of Mother's children is Margaret M. Lara (Lara).[1]

As part of the conservatorship case, the probate court created a substitute judgment trust for Mother.[2] In the order creating the trust, the court also ordered it would continue to supervise the trust. As a result, the trust proceedings took place within the conservatorship case. Mother died in February 2011. A conservatorship case would typically involve only a final accounting after the conservatee's death, and then the case would terminate. (§§ 1860, 2630;[3] *Conservatorship of Starr* (1989) 215 Cal.App.3d 1390, 1394 (*Starr*).) However, due to the trust proceedings, the case continued with various rulings being made.

---

[1] In this court's record, Lara is also referred to as Margaret M. Sanchez. We use the name Lara for clarity, since there are other people involved in the case with the last name Sanchez.

[2] A substitute judgment trust permits "a probate court to substitute its judgment for that of a conservatee." (*In re Conservatorship of Estate of Kane* (2006) 137 Cal.App.4th 400, 403.) Under this power, the probate court has the "power and authority to determine whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appears from all the circumstances that the ward, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent" [Citation.]'" (*Id.* at p. 404.)

[3] All further statutory references are to the Probate Code unless otherwise indicated.

In June 2011, the probate court ordered Lara to pay $5,000 "in sanctions" for attorney's fees that were incurred by Mother's attorney (Ortiz) as a result of Lara's failure to make certain agreed-upon payments, e.g., property taxes and insurance. In February 2012, the probate court ordered Lara to pay $12,696.50 for attorney's fees incurred by Ortiz as a result of Lara's failures (1) to communicate, and (2) to make certain agreed-upon payments, e.g. property taxes and insurance. In April 2012, the probate court ordered Lara to vacate the real property that had been owned by Mother and ordered the real property be sold to a conventional third party buyer.

Lara contends the probate court exceeded its jurisdictional authority by ordering the sale of the real property. Next, Lara asserts the probate court erred by ordering her to pay $12,696.50 in attorney's fees after previously ordering her to pay only $5,000 in fees. Lara asserts the court erred in regard to the attorney's fees: (1) under the doctrine of law of the case, (2) under the principle of judicial estoppel, and (3) by acting in excess of its jurisdiction. We affirm the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

Mother was born on November 8, 1921. Mother married Joe S. Sanchez (Father) in March 1940. Mother and Father had six children, including Sanchez, Yazell, Gutierrez, and Lara. In December 1980, Mother and Father purchased real property in Chino (the property). The property had two addresses, 5035 F Street and 5031 F Street ("the property" refers to the whole property with both addresses). Mother and Father acquired the property as joint tenants. Originally, there was a single family residence at the 5031 address (5031-house). In 1981, a second single family residence was

3

constructed at the 5035 address (5035-house). Upon completion of the construction, Mother and Father resided in the 5035-house.

Mother and Father permitted Lara to reside in the 5031-house for approximately 20 years, without paying rent. Father died in January 2004. Father resided at the 5035-house until his death. Mother continued to reside at the 5035-house after Father's death. At the time of Father's death, the 5031-house had a rental value of approximately $1,000 per month. Also at the time of Father's death, Mother's income consisted of social security and assistance from her children. Mother's only significant asset was the property, as she became the sole owner after Father's death.

In March 2004, Lara presented a document to Mother. The document transferred the property to Lara for no consideration. Lara filed the document with the San Bernardino County Recorder. Mother did not understand the nature of the document, or the difference between a deed and a testamentary document. It appeared Lara obtained Mother's signature on the deed by falsely asserting the document functioned in the nature of a will and would only transfer the 5031-house to Lara upon Mother's death. Additionally, Lara threatened Mother's caregivers, who had been hired by Co-conservators.

In August 2004, Co-conservators sought a conservatorship to protect Mother. Co-conservators asserted the conservatorship was needed due to Lara isolating Mother and causing Mother to transfer ownership of the property. The probate court ordered attorney Donnasue Smith-Ortiz (Ortiz) to represent Mother. In January 2005, the probate court appointed Co-conservators to their positions as Co-conservators. The

4

order granted Co-conservators (1) access to the 5035-house, and (2) authorization to recover the property, which had been transferred to Lara. The order also prohibited Mother from signing any document that would transfer her assets without prior court approval.

In June 2005, Co-conservators sought an order (1) declaring the deed, which transferred the property to Lara, to be void; and (2) requiring Lara to pay attorney's fees and court costs associated with the transfer of the property. Lara raised an issue concerning the accounting submitted by the Co-conservators. The parties agreed to attend mediation at IVAMS.

After the mediation, in March 2006, the Co-conservators and Lara agreed: (1) a substituted judgment trust would be drafted for Mother; (2) the trust would hold title to the property; (3) Lara would transfer the property into the trust; (4) Ortiz would act as trustee for the trust; (5) the probate court would continue to supervise the trust; (6) Mother would continue residing in her home unless physicians found it was necessary for her to move; (7) if the property were sold, then Lara would receive 40 percent of the net proceeds and 60 percent would be used for Mother's benefit, or if Mother died, then the 60 percent would go to the Co-conservators; (8) Lara would have the right of first refusal to purchase the property upon the trustee's decision to sell the property; (9) Lara would be required to reasonably maintain the 5031-house; (10) if Lara did not maintain the 5031-house, then the trustee could "give notice" to Lara; (11) Lara would pay the

property taxes and insurance "on the real property"[4] to Ortiz; (12) Lara and the Co-conservators would equally divide the water bill each month; and (13) the Co-conservators would continue to manage Mother's funds, separate from the trust.[5]

On May 3, 2007, Ortiz filed a trial brief reflecting Lara failed to transfer the property into the trust. Ortiz argued that Lara should be responsible for the fees and costs associated with the accounting and transfer of the property because Lara was "creating issues to misdirect the court [in] hope[s] that her own breach and failure to comply with the Stipulation and Order is not focused on in this trial." On May 7, 2007, the probate court entered an order declaring void the 2004 deed transferring the property to Lara. The court ordered the Co-conservators to execute a quitclaim deed transferring the property into Mother's trust.

In February 2009, Ortiz filed an accounting reflecting Lara owed (1) $765.80 for the 2007-2008 property tax; (2) $389.20 for the 2008 property insurance; (3) $861.42 for the 2008-2009 property tax; (4) $534 for the 2009 property insurance; and (5) $783.09 for the second installment of the 2008-2009 property tax. Ortiz requested the probate court order Lara to pay Ortiz $2,550.42 for the property tax and insurance, or order Lara to vacate the property. The probate court approved the accounting.

In October 2009, Yazell and Gutierrez submitted an accounting. The document reflected one of the Co-conservators, Sanchez, died in July 2009, thus leaving Yazell

---

[4] We infer "the real property" refers to the whole property, i.e., both addresses.

[5] It appears Lara signed the agreement as Margie Sanchez.

and Gutierrez as the remaining Co-conservators.[6] The document further reflected the Co-conservators had paid the property taxes and insurance to Ortiz, which Lara was supposed to pay. The Co-conservators requested the probate court order Lara to pay the Co-conservators $8,021.20 for the property taxes and insurance, or order Lara to vacate the 5031-house due to her breach of the 2006 agreement. The Co-conservators also requested the court order Lara to repair the roof and paint the interior and exterior of the 5031-house.

An amended accounting was filed, to which Lara objected. Trial dates were continued, vacated, and rescheduled. In February 2011, Ortiz submitted a trial brief. The brief reflected two issues to be addressed during trial were: (1) Lara's breach of the 2006 agreement, and (2) whether Lara "should be held liable for all compensation and costs of the co-conservators, and all other litigation costs and expenses incurred for filing her objections, most of which are outside the scope of this trial, without reasonable cause and in bad faith." Ortiz asserted Lara should be required to pay $7,927.75 in attorney's fees, for the period of March 2007 through July 2010.

On February 9 and 10, 2011, the court held a short cause trial. The probate court found all of Lara's objections to the accounting had been resolved or withdrawn. The court approved the Co-conservators' accounting. The court approved Ortiz's resignation as trustee and appointed the Co-conservators as successor trustees. The

---

[6] From this point, "Co-conservators" will refer only to Yazell and Gutierrez.

court ordered Lara to reimburse Mother's estate for the property tax and insurance payments made by the Co-conservators.

In regard to the sanctions/attorney's fees request, the court ordered Lara to "pay $5,000 in sanctions for her failure to adhere to the Stipulation dated March 14, 2006 requiring her to pay property tax and insurance for real property commonly referred to as 5031 and 5035 'F' Street Chino, San Bernardino County, California 91710 which thereby caused [Mother] to incur attorney's fees for Donnasue Smith Ortiz'[s] efforts to enforce the Stipulation terms."

The court ordered Lara to pay $500 per month ($325 for property tax and $175 for sanctions) directly into a certain bank account. If Lara failed to pay the $500 after 30 days, Lara would be in breach and the Co-conservators/co-trustees could bring an ex parte action to terminate Lara's tenancy. The order reflected the terms of the order were agreed upon in the judge's chambers with the judge and all attorneys being present. Mother died on February 13, 2011.

In May 2011, the Co-conservators moved for sanctions against Lara and requested Lara be required to pay attorney's fees for Ortiz in the amount of $12,696.50. Co-conservators asserted Lara should pay Ortiz's fees because the fees were incurred by Mother due to Lara's "continual breach" of the 2006 agreement and frivolous objections to the accountings. The motion reflected Lara had breached the agreement by (1) failing to pay the property tax and insurance, and (2) receiving code violations from the City of Chino "on numerous occasions for failing to maintain the residence." The Co-

8

conservators alleged they had paid the property taxes and insurance "from 2005 to present."

In August 2011, the Co-conservators/co-trustees, filed an accounting and request for reimbursement. Co-conservators requested the court (1) order Lara to pay "sanctions" in the amount of $12,696.50 for the attorney's fees incurred by Ortiz; (2) find that Lara breached the agreement requiring her to pay $500 per month; (3) find Lara to be in contempt of court for not making the required payments; and (4) order Lara is no longer permitted to reside at the 5031-house. Lara objected to the accounting. Lara also requested she (1) be permitted to "exercise her right of first refusal as per [the] signed stipulation in March 2006," and (2) not be required to pay Ortiz's attorney's fees.

Also in August, the Co-conservators filed an ex parte application for Lara to cooperate with the sale of the property. Co-conservators asked the probate court to determine whether (1) they could proceed with the sale of the property, and (2) Lara still had a right of first refusal despite her "continual breach."

In September, the Co-conservators filed a brief to clarify the $5,000 sanctions order in relation to their request for Lara to pay $12,696.50 for Ortiz's attorney's fees. Co-conservators explained that, in August 2010, Ortiz's bill totaled $7,927.75 in charges incurred due to Lara. The Co-conservators requested Lara pay $8,000 for the fees, but had ultimately agreed to the lesser amount of $5,000. The Co-conservators paid Ortiz $8,381 in December 2010. Lara did not make the required $500 monthly payments, which included payment on the agreed upon $5,000 sanctions award. The

9

Co-conservators explained that the $5,000 award covered work performed by Ortiz in 2010, and did not cover fees incurred for trial preparation in 2011. Thus, the $5,000 was partial payment on earlier work performed by Ortiz, while the $12,696.50 was a different bill for trial preparation. Ortiz submitted a statement reflecting the $12,696.50 bill covered the period from August 5, 2010 to April 4, 2011.

On October 17, 2011, Lara submitted a declaration reflecting (1) she never signed any order from the court, and (2) she was never "notified of any pending or past due homeowner[']s property insurance." On October 19, the probate court held a hearing in the matter. The court asked if the property would be sold and whether Lara was interested in purchasing the property, since she had a right of first refusal. The Co-conservators'/co-trustees' attorney informed the court that Lara had not yet made an offer on the property and requested a deadline be set for Lara to make an offer. The parties raised issues about appraisals for the property and mortgages on the property. The court found the property matter involved "too many issues," since the parties likely "can't agree on the appraisals and then liens and so on, so forth." The court ordered the parties to submit appraisals and declarations in support of their arguments on the property issue by November 21. The court scheduled a hearing for December 1 to decide the issues related to the property and attorney's fees.

Lara did not file documents about the property by November 21; she filed them on November 28. At the hearing on December 1, Co-conservators' attorney explained that Lara had not made an offer to purchase the property; rather, she submitted an appraisal for only the 5031-house —not the whole property, which included both

10

addresses/residences. Lara's son explained that an offer had not been made because the property was still in Mother's name—not the trust's name, i.e., Co-conservators allegedly did not execute the quitclaim deed placing the property in the trust's name. The court took the matter under submission.

In February 2012, the probate court issued a ruling. The court ordered Lara to pay (1) Ortiz's attorney's fee bill of $12,696.50; (2) the unpaid property tax and insurance bills; and (3) maintenance bills for the property. The court explained that Lara failed to make proper payments during the five year period. For example, Lara's checks were made out to the trust, rather than Ortiz. Additionally, Lara made a tax payment directly to the Assessor's Office, and then failed to communicate with Ortiz. Lara did not respond to Ortiz's requests for payment, so Ortiz also paid the tax bill, causing a double payment that had to be researched. The court found the majority of Ortiz's fees were incurred as a result Lara's actions or inactions.

In regard to the sale of the property, the court found the 2006 agreement gave Lara the right of first refusal. In its ruling, the court wrote, "There have been many attempts to inspect the property, list the property, and in general, cooperate in an effort to either sell it or have [Lara] buy it. [¶] There has never been a solution. Each side blames the other and there can never be a solution unless the Court takes charge of it. [¶] The court has jurisdiction to settle this matter. [¶] The Court will select a broker from three names of brokers who will accept this job. Each side is to give me three brokers who will actively try to sell the property. [¶] The person/firm selected shall

11

have complete access to the property. [Lara] is enjoined from interfering with the broker's access to the property. She must cooperate.

"The broker shall explore all the possible ways that [Lara] could purchase the property. The broker needs to cooperate with any lender that [Lara] wishes to use in her endeavor to buy the house. When both a plan to sell and a plan to buy has been arrived at, the Court will be notified. The Court will then decide if [the property] is to be sold and to whom."

On April 6, 2012, the Co-conservators filed an ex parte application for instructions and an order requiring Lara to cooperate with the sale of the property. The Co-conservators explained that Lara "made an offer to purchase the property through an untraditional reverse mortgage." The Co-conservators rejected Lara's offer. The Co-conservators asserted they received "multiple" other offers, but could not provide the prospective buyers a walk-through of the property because Lara's dog roamed freely on the property and Lara called the police when visitors arrived. The Co-conservators asserted they lost three offers for $299,000. The Co-conservators asked the court to order Lara (1) to restrain her dog in the yard; (2) to provide a key to the 5031-house; (3) to permit the realtor to show the property when given 24 hours notice; and (4) to vacate the 5031-house in 30 days.

The court held a hearing in the matter on April 12, 2012. Co-conservators' attorney explained that Lara wanted a reverse mortgage on the property, which is a loan on the property—not an offer to purchase the property. The court explained to Lara's attorney that Lara had been given approximately three years to purchase the property,

but she had failed to make an offer despite being encouraged to do so. The court instructed counsel to work together to effectuate a sale of the property. The court scheduled another hearing for the following week because the Co-conservators had received an all cash offer on the property from a third party.

On April 16, 2012, in a reply to the ex parte petition, Lara explained that she submitted an offer to purchase the property, but the offer was rejected without a counteroffer. Lara also explained she was unwilling to pay a commission for the realtor. Lara asserted that if the court interpreted the right of first refusal as requiring Lara to match the other offers submitted, then Lara wanted an opportunity to match those offers.

In a response, the Co-conservators explained that Lara's "offer" was not really an offer, but was rather an expressed intent to make an offer. The Co-conservators asserted the document submitted by Lara as an "offer" was not truly an offer because it failed to include the basic elements of an offer, such as the exact type of reverse mortgage Lara will obtain and the exact amount of reverse mortgage funding Lara will obtain. The Co-conservators requested they be permitted to sell the property to a buyer with pre-approved financing.

On April 18, 2012, the court held another hearing in the matter. Lara's counsel (Brock) argued that Lara's offer was not deficient. Brock explained Lara would give the Co-conservators the full value for the property, but wanted to put the title in Lara's name first, so that Lara would be refinancing the property, which is "easier." Brock

13

asserted the Co-conservators should not be permitted to reject Lara's offer solely because Lara did not want traditional financing.

The probate court said, "What I see here is really more of the same stuff. I really do. And that is dictating terms and conditions with respect to sale or the purchase of the house that are maybe pie-in-the-sky ideas. I don't know if she can qualify for any kind of loan. There is nothing in there to indicate to me that she can. [¶] The idea of a reverse mortgage, I never thought of that at all. I don't know. . . . The cleaner way to do it is to sell the property and divide it up. That is the only way to do it."

Brock asserted Lara and her children would make a traditional offer of $300,000 and would return to court "in a short period with a loan guarantee or loan approval." The court explained that it had been telling Lara to make that type of offer for approximately two years. The Co-conservators argued that Lara had "been given the opportunity" many times to make a traditional purchase offer for the property. The court said, "I am going to say, 'Sell for that'"—referring to the offer of $299,900 that had been submitted by a third party. Brock asked if the court would give Lara the opportunity to offer more than $300,000. The court responded, "You know, Mr. Brock, I have done that I can't tell you how many times. I am just actually tired of it. Okay." The court ordered that Lara must vacate the 5031-house within 30 days.

## DISCUSSION

### A.   JURISDICTION TO ORDER THE SALE

####   1.   *FACTS*

Lara's attorney (Brock) was somewhat new to the case at the time of the April 12, 2012 hearing.  At the beginning of the hearing, the following exchange took place:

"The Court:  Are you familiar with a number of the issues involved and this house?

"Mr. Brock:  I'm most familiar with following [*sic*] an understanding from the Court's ruling of February 23.

"The Court:  Oh, okay.

"Mr. Brock:  And in seeing this petition, I have trouble connecting the two because this petition doesn't appear to be following what the Court's ruling was about how we were going to sell the house.  Having said that, I need to inform the Court that I have filed, April 6, a petition in a—under a trust matter, same case—or same matter because of title issues.  As I read the file, I was not certain whether the title was in the name of the decedent, in the name of the conservatee, but it definitely was not in the name of the trustees.  And to clear title from the title company, in review of their preliminary title report, they wanted it in the name of the trustees.  So I filed a petition for determination of title plus quiet title because there are some very old liens against the property and with—it includes an offer to purchase the property by my client.

"The Court:  Do you know that, if I recall, that this Court took jurisdiction of the trust many years ago?

15

"Mr. Brock: I saw that the Court created the trust.

"The Court: Yes, that's correct, if I recall. And the trustee eventually was the— originally was, I think, Ms. Ortiz and then subsequently the petitioners.

"Mr. Brock: Yes. And, see, your Honor, I filed it that way as a—

"The Court: Why wouldn't you file it right in this action, because that's where the trust action is?

"Mr. Brock: In an overabundance of caution.

"The Court: All right.

"Mr. Brock: Because I'm reading your order and I felt like I was going to have to file and pay a filing fee in the conservatorship action, but I might have a problem with the title company. And the title company's saying, [w]e appreciate what the judge's order says, but it should have been the trust and we want it—the order to come from the trust. Now, I probably could have convinced the title company to take it, but just out of an overabundance of caution—and when I filed that, on the cover sheet, I referenced that it is related to this case.

"The Court: Well, you should have filed it –

"Mr. Brock: I apologize."

####   2.   *ANALYSIS*

Lara contends the probate court lacked jurisdiction to order the sale of the property since the case was designated as a conservatorship proceeding. Lara uses the terms "fundamental jurisdiction" and "excess of jurisdiction" in describing the alleged

error.  It appears the issue would be better characterized as an act asserted to be in excess of jurisdiction—not a lack of fundamental jurisdiction.

"The principle of 'subject matter jurisdiction' relates to the inherent authority of the court involved to deal with the case or matter before it.  [Citation.]  In contrast, a court acts in excess of jurisdiction '"where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no 'jurisdiction' (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites."'  [Citation.]" (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1087-1088 (*O'Connor*).)

So, in this case, it is an excess of jurisdiction question, because the issue is whether, in this conservatorship proceeding, the court could continue issuing rulings related to the trust after Mother died in February 2011.  It is not an issue of the court lacking fundamental jurisdiction over the subject matter or the parties, but whether the court went beyond the bounds of its authority to act.  It appears there was subject matter jurisdiction because the probate court has jurisdiction over conservatorships (§ 2200) and the property and conservatee were located in San Bernardino County.

"Death of the conservatee does not terminate the probate court's jurisdiction over the conservatorship estate.  The court retains jurisdiction over the estate 'for the purpose of settling the accounts of the guardian or conservator *or for any other purpose incident to* the enforcement of the judgments and orders of the court upon such accounts . . . .' (§ 2630, italics added.)  Relevant case law illustrates that the scope of the court's

17

jurisdiction should be construed broadly to accomplish these goals.  [Citations.]"

(*O'Connor*, *supra*, 48 Cal.App.4th at pp. 1088-1089.)

"In contrast to cases involving other types of jurisdictional defects, a party may

be precluded from challenging [an] action in excess of a court's jurisdiction when the

circumstances warrant applying principles of estoppel, disfavor of collateral attack or

res judicata.  [Citation.]" (*O'Connor*, *supra*, 48 Cal.App.4th at p. 1088, fn. omitted.)

"When '"the court has jurisdiction of the subject matter, a party who seeks or consents

to action beyond the court's power as defined by statute or decisional rule may be

estopped to complain of the ensuing action in excess of jurisdiction.  [Citations.]

Whether he shall be estopped depends on the importance of the irregularity not only to

the parties but to the functioning of the courts and in some instances on other

considerations of public policy.  A litigant who has stipulated to a procedure in excess

of jurisdiction may be estopped to question it when '[t]o hold otherwise would permit

the parties to trifle with the courts.'"  [Citations.]'  [Citation.]" (*O'Connor*, *supra*, 48

Cal.App.4th at p. 1092.)

The record reflects Lara consented to the sale of the property being handled as

part of the conservatorship proceedings.  In 2006, the probate court entered an order, as

a result of the parties' stipulations, reflecting, in part, (1) a substituted judgment trust

would be created for Mother; (2) Lara would have a right of first refusal to purchase the

property upon the trustees' decision to sell the property; and (3) "[t]he trust shall

continue to be subject to the court's supervision."

Lara stipulated that the conservatorship court would continue to supervise the trust, thus reflecting an agreement that the court could made trust decisions in the conservatorship proceedings. Lara tried to enforce the portion of the order that related to her right of first refusal, which reflects Lara does not contest the order that created the trust. Additionally, when Brock was asked why he filed documents related to the trust in a separate trust action, he did not explain that he believed the court lacked jurisdiction because it was a conservatorship case; rather, he said he acted out of an abundance of caution, thus failing to raise the issue in the probate court. Given the foregoing points, especially Lara's stipulation to the court's continuing supervision of the trust, Lara is estopped from arguing the excess of jurisdiction issue because she stipulated to the trust being addressed in the conservatorship proceedings.

Nevertheless, if Lara is not estopped, the court also acted within its jurisdiction. As set forth *ante*, a conservatorship terminates upon the death of the conservatee. (§ 1860.) After the death of the conservatee, the probate court's jurisdiction is delineated by section 2630, which provides: the probate court retains jurisdiction "for any other purpose incident to the enforcement of the judgments and orders of the court upon [the guardian's or conservator's] accounts." (§ 2630; *O'Connor*, *supra*, 48 Cal.App.4th at p. 1089; *Starr*, *supra*, 215 Cal.App.3d at p. 1394.)

As explained *ante*, in March 2006, following stipulations by the parties, the probate court entered an order (1) creating the trust; (2) making the trust subject to the court's continuing supervision; and (3) granting Lara the right of first refusal to purchase the property. By overseeing the sale of the property, the probate court was

19

enforcing the orders made in the conservatorship case. The court was deciding whether Lara had been given a reasonable right of first refusal, and following through with disposal of the trust's or Mother's most significant asset.[7] Accordingly, the court acted within its jurisdiction.

Lara asserts the probate court acted in excess of its jurisdiction because, in a conservatorship proceeding, a probate court does not have authority to liquidate assets, unless the estate is very small. Lara asserts the property was worth over $200,000, so the estate was not small. Lara's argument is not persuasive because it does not take into account the particular orders and stipulations made in this case, which granted the probate court supervisory power over the trust within the conservatorship proceedings.

Lara contends that if the property were a trust asset, not a conservatorship asset, then the probate court only had the power to settle the Co-conservators' accounting— the conservatorship proceeding was necessarily terminated after that point. We do not find this argument persuasive due to the stipulations and orders in the record, along with the estoppel reasoning set forth *ante*. Lara stipulated to the trust being supervised within the conservatorship proceedings; ignoring the stipulation or trying to bypass it would be trifling with the courts.

---

[7] It is unclear from the record whether, at the time of the order, the property was being held in Mother's name or the trust's name.

## B.     ATTORNEY'S FEES

### 1.     *CONTENTION*

Lara asserts the court erred by ordering Lara to pay attorney's fees:  (1) under the doctrine of law of the case, (2) under the principle of judicial estoppel, and (3) by acting in excess of its jurisdiction.

### 2.     *NOTICE OF APPEAL*

Co-conservators assert Lara's notices of appeal do not include the order requiring Lara to pay $5,000 in sanctions/attorney's fees, and therefore, Lara cannot argue error as to that order.  We agree that the notices of appeal do not include the order for the $5,000 sanctions/attorney's fees.  Nevertheless, it appears Lara's arguments are focused on the award of $12,696.50, as opposed to the $5,000 award.  Accordingly, we address the issues she raises on appeal.

### 3.     *EXCESS OF JURISDICTION*

Lara contends the Probate Code does not authorize the probate court to order a party to pay attorney's fees for a conservatee's court-appointed attorney.

In the court's ruling related to the $12,696.50 attorney fee award, the court wrote, "[Lara's] failure to communicate with Attorney Ortiz has resulted in unnecessary legal expenses imposed upon Conservatee.  Since, 2006, Ms. Ortiz's law office has been burdened with sending correspondence and phone calls to [Lara] on a monthly basis to get her to comply with the Stipulation to pay the property tax and insurance.  [Lara] claims she does not receive correspondence.  [¶]  Even five years after the Stipulation, [Lara] does not send the proper payment."

21

The Co-conservators assert the award of attorney's fees was within the court's jurisdiction because the fees were awarded in the trust portion of the case, not the conservatorship portion of the case, and courts have jurisdiction to award attorney's fees in trust cases. Thus, Lara characterizes the case as a conservatorship matter, wherein she alleges fees cannot be awarded, while Co-conservators/co-trustees characterize the case as a trust matter, wherein attorney's fees can be awarded.

In regard to conservatorship proceedings, section 2622.5, subdivision (a) provides, "If the court determines that the objections were without reasonable cause and in bad faith, the court may order the objector to pay the compensation and costs of the conservator or guardian and other expenses and costs of litigation, *including attorney's fees*, incurred to defend the account. The objector shall be personally liable to the guardianship or conservatorship estate for the amount ordered." (Italics added.)

In regard to trust proceedings, section 17211, subdivision (a), provides: "If a beneficiary contests the trustee's account and the court determines that the contest was without reasonable cause and in bad faith, the court may award against the contestant the compensation and costs of the trustee and other expenses and costs of litigation, *including attorney's fees*, incurred to defend the account. The amount awarded shall be a charge against any interest of the beneficiary in the trust. The contestant shall be personally liable for any amount that remains unsatisfied." (Italics added.)

In conservatorship proceedings and trust proceedings, a probate court can order a party to pay attorney's fees, if the party's litigation is unreasonable and in bad faith. In this case, the motions for attorney's fees were based upon Lara's allegedly bringing

"frivolous issues raised in bad faith." In its findings related to the attorney's fees award, the probate court described Lara's failures to communicate and payment errors that continued over a five-year period. The probate court's findings reflect unreasonable and bad faith actions taken by Lara. Accordingly, the probate court, in this hybrid conservatorship-trust case, had jurisdiction to order Lara to pay attorney's fees. (§§ 2622.5, subd. (a), 17211, subd. (a).)

### 4.     *ESTOPPEL*

Lara contends principles of estoppel prevent the probate court from ordering Lara to pay attorney's fees in the amount of $12,696.50, after the court had already made an order requiring Lara to pay $5,000 in attorney's fees. Lara asserts there was a single bill of $12,696.50, and the court ordered Lara to pay $17,696.50 for that single bill.

The doctrine of judicial estoppel "'applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." [Citations.]' [Citation.]" (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 47.)

There are three bills that are relevant to the instant inquiry. The first bill is included in Ortiz's petition for an order requiring the Co-conservators to pay her attorney's fees. The petition was filed August 20, 2010. The petition requests the Co-

23

conservators pay Ortiz $8,381 for work performed from February 3, 2009, through July 29, 2010.

The second bill is included in Ortiz's trial brief, which was filed February 9, 2011. In the brief, Ortiz asserts an issue for trial is whether Lara should be required to pay attorney's fees for bringing unreasonable and bad faith litigation. Ortiz asserts Lara should be required to pay $7,927.75. The bill covers work performed from March 13, 2007, through July 29, 2010, and is limited to the work created by Lara's actions or inactions.

On February 9 and 10, 2011, the trial court held a "short cause trial" in the case. In the "Order After Hearing," the court ordered Lara to "pay $5,000 in sanctions for her failure to adhere to the Stipulation dated March 14, 2006 . . . which thereby caused [Mother] to incur attorney's fees for Donnasue Smith Ortiz'[s] efforts to enforce the Stipulation terms." The Order After Hearing was not filed by the court until June 20, 2011; however, it corresponds to the February hearing, as evinced by: (1) the introduction discussing the February hearing, and (2) the order reflecting February dates. For example, part of the order reflects: Lara shall pay Ortiz $1,312 "for home owners [*sic*] insurance now due on or before February 18, 2011."

The third bill is mentioned in the Co-conservators' motion for sanctions/attorney's fees, which was filed on May 17, 2011. In the motion, Co-conservators request Lara pay attorney's fees in the amount of $12,696.50. On August 25, 2011, Co-conservators filed a first amended final accounting, in which they again requested Lara be ordered to pay $12,696.50 in attorney's fees. The bill reflects it

24

covers work performed by Ortiz from July 31, 2010, through April 4, 2011. On February 23, 2012, the probate court issued a ruling ordering Lara to pay attorney's fees in the amount of $12,696.50.

The $5,000 bill resulted from the attorney's fee bills for $8,381 (the whole bill) or $7,927.75 (the bill focused on Lara's issues), which both covered work performed through July 29, 2010. The $5,000 award deals with one of these two bills because the award was made following the February 2011 short cause trial, which occurred prior to the requests for an award of $12,696.50.

Further, the $12,696.50 bill is separate from the $8,381 bill because the $12,696.50 bill reflects a credit, paid by the Co-conservators for $8,381. So there was a second, independent, bill with a total amount due of $12,696.50, which covered the period from July 31, 2010 to April 4, 2011. Accordingly, there were two separate bills, covering two different time periods. The court did not order Lara to pay $17,696.50 for a single $12,696.50 bill; rather, the court ordered Lara to pay a total of $17,696.50 for two bills that totaled approximately $21,077.50.

In sum, looking at the record, the awards do not conflict with one another such that judicial estoppel should apply. The $5,000 award relates to the $8,381 bill or the $7,927.75 bill, while the $12,696.50 award relates to the $12,696.50 bill. Thus, there is not a changed position; the two awards concern separate matters. Accordingly, judicial estoppel is not applicable.

5. *LAW OF THE CASE*

Lara contends the doctrine of law of the case provides the court could not order Lara to pay $5,000 in attorney's fees and then make a second order requiring Lara to pay $12,696.50 for the same bill.

"The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration [the appellate] court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.)

The probate court's order concerning attorney's fees does not fall within the law of the case doctrine, since the law of the case doctrine is triggered by an appellate court opinion. Accordingly, we conclude Lara's reliance on the law of the case doctrine is unpersuasive.

C. APPELLATE ATTORNEY'S FEES

Co-conservators request this court award them attorney's fees on appeal, or, in the alternative, direct the probate court to consider whether attorney's fees should be awarded to Co-conservators. Co-conservators assert Lara's appeal is meritless and frivolous. Co-conservators (1) do not explain how the issues raised in this hybrid conservatorship and trust case are meritless, and (2) do not cite any law to support their request. Accordingly, we deny Co-conservators' request for attorney's fees on appeal

26

because they have not provided legal analysis.  The denial is without prejudice to Co-conservators seeking such fees in the probate court.  (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 459.)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RICHLI
Acting P. J.

CODRINGTON
J.